## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION AT KNOXVILLE

JOEL ROSENFELD, on Behalf of Himself
and All Others Similarly Situated,

            Plaintiff,

    v.

RUBY TUESDAY, INC., JAMES F.
HYATT, II, STEPHEN I. SADOVE, F.
LANE CARDWELL, JR., MARK W.
ADDICKS, KEVIN T. CLAYTON,
DONALD E. HESS, BERNARD LANIGAN
JR., and JEFFREY J. O'NEILL,

            Defendants.

Civil Action No.:

**CLASS ACTION COMPLAINT AND
DEMAND FOR JURY TRIAL**

Plaintiff Joel Rosenfeld ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of his counsel as to all other allegations herein, as follows:

### SUMMARY OF THE ACTION

1.     This is a class action brought on behalf of the public stockholders of Ruby Tuesday, Inc. ("Ruby Tuesday" or the "Company") against Ruby Tuesday and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9 and to enjoin the vote on a proposed transaction, pursuant to which Ruby Tuesday will be acquired by NRD Capital through NRD Ventures, LLC, NRD Partners II, L.P. (together with NRD Capital

and NRD Ventures, LLC, "NRD"), NRD's affiliate RTI Holding Company, LLC ("Holding") and Holding's wholly-owned subsidiary RTI Merger Sub, LLC ("Merger Subsidiary") (the "Proposed Transaction").

2.      On October 16, 2017, Ruby Tuesday issued a press release announcing it had entered into an Agreement and Plan of Merger dated October 16, 2017 (the "Merger Agreement") with NRD, pursuant to which NRD will acquire Ruby Tuesday.  Under the terms of the Merger Agreement, Ruby Tuesday stockholders will have the right to receive $2.40 in cash for each share of Company common stock they own (the "Merger Consideration").  The Proposed Transaction is valued at approximately $335 million.

3.      On October 31, 2017, Ruby Tuesday filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy") with the SEC.  The Proxy, which recommends that Ruby Tuesday stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the background process leading up to the Proposed Transaction; (ii) the valuation analyses prepared by the Company's financial advisor UBS Securities LLC ("UBS") in connection with the rendering of its fairness opinion; (iii) Ruby Tuesday management's projections; and (iv) insiders' potential conflicts of interest.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Ruby Tuesday stockholders need such material information in order to cast a fully-informed vote or seek appraisal in connection with the Proposed Transaction.

4.      In short, unless remedied, Ruby Tuesday's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff

seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     The Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391 because Ruby Tuesday is headquartered in this District, and a substantial portion of the events or omissions giving rise to the claims occurred in this District.  Moreover, each of the Individual Defendants as Company officers and/or directors has extensive contacts within this District.

## PARTIES

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, a continuous stockholder of Ruby Tuesday.

9.     Defendant Ruby Tuesday is a Georgia corporation with its principal executive offices located at 333 East Broadway Avenue, Maryville, Tennessee 37804.  Ruby Tuesday's common stock is traded on the New York Stock Exchange under the ticker symbol "RT."

10.     Defendant James F. Hyatt, II ("Hyatt") has been Chief Executive Officer ("CEO"), President and a director of the Company since April 2017.

11.     Defendant Stephen I. Sadove ("Sadove") is Chairman of the Board and has been a director of the Company since 2002.

12.     Defendant F. Lane Cardwell, Jr. ("Cardwell") has been a director of the Company since 2012.  Defendant Cardwell previously served as Interim President and Interim CEO from September 2016 to April 2017.

13.     Defendant Mark W. Addicks ("Addicks") has been a director of the Company since 2014.

14.     Defendant Kevin T. Clayton ("Clayton") has been a director of the Company since 2006.

15.     Defendant Donald E. Hess ("Hess") has been a director of the Company since 2014.

16.     Defendant Bernard Lanigan Jr. ("Lanigan") has been a director of the Company since 2001.

17.     Defendant Jeffrey J. O'Neill ("O'Neill") has been a director of the Company since 2012.

18.     Defendants identified in paragraphs 10-17 are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

19.     NRD Capital is a private equity firm founded in 2014, investing with small to medium-sized franchisors and chain businesses.

20.     NRD Ventures, LLC is a limited liability company formed in March 2016 to conduct acquisition activities.

21.     NRD Partners II, L.P. is a private equity fund founded in August 2016.

4

22.     Holding is an affiliate of NRD Partners II, L.P. and was formed in August 2017 solely for the purpose of completing the Proposed Transaction.

23.     Merger Subsidiary is a wholly-owned subsidiary of Holding and an affiliate of NRD Partners II, L.P.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Ruby Tuesday common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

25.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

26.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of October 24, 2017, there were approximately 60,690,527 shares of Ruby Tuesday common stock issued and outstanding.  All members of the Class may be identified from records maintained by Ruby Tuesday or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

27.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable harm were the Proposed Transaction consummated.

28.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

30.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background

31.     Ruby Tuesday owns, operates and franchises the Ruby Tuesday casual dining restaurant chain in the bar and grill segment of the casual dining industry.  As of June 6, 2017, the Company owned and operated 543, and franchised 62, Ruby Tuesday restaurants.  Of the 62 franchised restaurants, 17 were operated by the Company's domestic franchisees and 45 were operated by its international franchisees.

32.     The first Ruby Tuesday restaurant opened in 1972 in Knoxville, Tennessee.  The Ruby Tuesday concept, which at the time consisted of 16 restaurants, was acquired by Morrison Restaurants Inc. ("Morrison) in 1982.  During the following years, Morrison grew the concept to

6

over 300 restaurants. In a spin-off transaction that occurred on March 9, 1996, Morrison distributed two of its separate businesses to its shareholders, Morrison Fresh Cooking, Inc. and Morrison Health Care, Inc. In conjunction with the spin-off, Morrison reincorporated in Georgia and changed its name to Ruby Tuesday, Inc.

33.     In August 2016, the Company launched its Fresh Start initiatives, intended to streamline the organization, improve financial profitability, and drive more significant top line growth over time. The key components of the Fresh Start initiatives include a new menu intended to provide culinary innovation, a new Garden Bar restaged and improved to offer over 50 items, and a Fresh New Experience, focused on revitalizing the Ruby Tuesday brand by improving the Company's services and overall guest experience.

**The Sale Process**

34.     On September 23, 2016, NRD sent the Board a letter of intent, outlining NRD's interest in a potential acquisition of the Company for $3.50 per share. The Board decided not to pursue NRD's proposal and to instead focus on implementing management's plan to improve the Company's operations and execution. NRD reiterated its $3.50 per share offer on January 11, 2017.

35.     At a February 13, 2017 meeting, UBS discussed with the Board its valuation analyses of the Company which was based on a revised set of projections dated February 6, 2017 that Ruby Tuesday's management provided UBS, which were revised downward from the previous plan provided to UBS on November 11, 2016.

36.     On March 10, 2017, UBS again discussed with the Board its valuation analyses of the Company based on a further revised set of financial projections provided by the Company's management on March 7, 2017, which were also revised downward from the February 6, 2017

set of projections.

37.     In March 2017, UBS engaged in preliminary discussions with 47 parties regarding a potential acquisition of the Company or its real estate assets.  Ruby Tuesday entered into confidentiality agreements that contained standstill provisions with 23 of these parties. However, the Proxy fails to disclose whether these provisions are "don't-ask-don't-waive" ("DADW") standstill provisions that are currently precluding any interested parties, other than parties referred to in the Proxy as "Bidder 8" and "Bidder 11" from submitting a topping bid for the Company.

38.     Notably, on April 13 and April 14, 2017, Ruby Tuesday received preliminary indications of interest from nine parties that had executed confidentiality agreements with the Company.  Over the course of the next several months, numerous bidders engaged in due diligence and negotiations with the Company.

39.     The Company received multiple offers, including a July 12, 2017 offer from NRD to acquire the Company for $2.55 per share and a July 24, 2017 offer from Bidder 11 to acquire the Company for $2.88 per share.

40.     On August 14, 2017, Ruby Tuesday entered into a No-Shop Agreement with NRD, agreeing to negotiate exclusively with NRD for 30 days until September 13, 2017 (extendable to 45 days under certain circumstances).  In connection with negotiations of the No-Shop Agreement, NRD assured UBS it would not lower its offer price below $2.55 in the future. The No-Shop Agreement expired on September 13, 2017 and was not extended.

41.     On October 9, 2017, Bidder 11 submitted an updated offer to acquire Ruby Tuesday, with an offer price of $2.88 per share.

42.     On October 13, 2017, NRD submitted its final proposal to acquire Ruby Tuesday

8

for $2.40 per share (reduced from NRD's previous offer of $2.55 per share).

43.    At an October 15, 2017 Board meeting, UBS rendered its fairness opinion and the Board approved the Merger Agreement.  The next day, the parties executed the Merger Agreement and related transaction documents.

**The Proposed Transaction**

44.    On October 16, 2017, Ruby Tuesday issued a press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> MARYVILLE, Tenn., Oct. 16, 2017 -- Ruby Tuesday, Inc. (NYSE:RT) today announced an agreement to be acquired by a fund managed by NRD Capital ("NRD"), an Atlanta-based private equity firm that specializes in franchised and multi-location business investments.
>
> Under the terms of the agreement, NRD will acquire all of Ruby Tuesday's common stock for $2.40 per share in cash and will assume or retire all debt obligations for a total enterprise value of approximately $335 million, excluding transaction expense. The purchase price represents a premium of approximately 37% over Ruby Tuesday's closing share price on March 13, 2017, the day before the Company announced its intention to explore strategic alternatives, and a premium of approximately 21% over Ruby Tuesday's closing share price on October 13, 2017.
>
> "The Board of Directors and our advisors have thoroughly evaluated all options available to the Company and are confident that this agreement will provide the most promising opportunity to realize the highest value for our stockholders while providing the best path forward for the Ruby Tuesday brand, its employees, franchisees, and loyal customers," said Stephen Sadove, Non-executive Chairman of Ruby Tuesday. "NRD Capital has a distinguished track record of achieving and maintaining profitable growth for restaurant concepts and will be an excellent partner to lead Ruby Tuesday going forward."
>
> The transaction has been unanimously approved by Ruby Tuesday's Board of Directors and NRD and is subject to shareholder approval and other customary closing conditions. The acquisition is expected to be completed during the first calendar quarter of 2018. UBS Investment Bank is serving as financial advisor to Ruby Tuesday and provided a fairness opinion to the Ruby Tuesday Board of Directors.
>
> "Our focus at NRD is investing in quality restaurant companies and providing strategic and operational expertise to create sustainable value. With a well-

established brand, differentiated from other casual dining restaurants by its Garden Bar, we see significant opportunities to drive value for Ruby Tuesday," said Aziz Hashim, founder of NRD. "We are excited to be part of the Company's next chapter. As a private company, we will be able to take a long-term view on Ruby Tuesday, allowing us to make an investments in people, product, and customer experience, without public company constraints. This approach will enable us to reward everyone involved in our success, in addition to our investors."

**Insiders' Interests in the Proposed Transaction**

45.     NRD and Ruby Tuesday insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Ruby Tuesday.

46.     While Ruby Tuesday's public stockholders are being cashed out for the inadequate Merger Consideration and foreclosed from participating in the future growth of the Company, certain Company insiders stand to reap a substantial financial windfall for securing the deal with NRD.  Upon consummation of the Proposed Transaction, each equity-based and performance-based cash award held by Ruby Tuesday executive officers, whether vested or unvested, will automatically vest and convert into the right to receive cash payments.  Defendant Hyatt stands to receive nearly $1.2 million in connection with the vesting of his restricted stock. The following table sets forth the cash payments Ruby Tuesday executive officers stand to receive in connection with their equity awards:

| Name | Cash ($)(1) | Equity ($)(2) | Pension/ NQDC ($) | Perquisites/ Benefits ($)(3) | Tax Reimbursement ($) | Total ($) |
|---|---|---|---|---|---|---|
| *Named Executive Officers* | | | | | | |
| James F. Hyatt, II, President and Chief Executive Officer | 850,000 | 1,184,374 | 0 | 0 | 0 | 2,034,374 |
| Linda Sue Briley, Chief Financial Officer | 1,134,047 | 283,541 | 0 | 48,235 | 0 | 1,465,823 |
| Michael K. Ellis, Chief Development Officer | 1,110,714 | 273,077 | 0 | 50,946 | 0 | 1,434,737 |
| Rhonda J. Parish, Chief Legal Officer and Secretary | 1,211,557 | 307,838 | 0 | 53,448 | 0 | 1,572,843 |
| Davis W. Skena, Chief Marketing Officer | 1,177,381 | 302,978 | 0 | 52,854 | 0 | 1,533,213 |
| James J. Buettgen, Former Chairman, President and Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 |
| F. Lane Cardwell, Jr., Former Interim Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 |
| Brett A. Patterson, Former Ruby Tuesday Concept President | 0 | 0 | 0 | 0 | 0 | 0 |
| *Other Executive Officer* | | | | | | |
| Thomas A. Williams, Chief People Officer | 1,110,714 | 273,077 | 0 | 53,025 | 0 | 1,436,816 |

47.     In addition, if they are terminated in connection with the Proposed Transaction, Ruby Tuesday's named executive officers are set to receive substantial cash payments in the form of golden parachute compensation, as set forth in the following table:

| Name | Value of Unvested Stock Options ($) | Value of Vested Stock Options ($) | Value of Restricted Stock ($) | Value of RSUs ($) | Value of Phantom Stock Units ($) | Value of PSUs ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| *Named Executive Officers* | | | | | | | |
| James F. Hyatt, II, President and Chief Executive Officer | 0 | 0 | 1,184,374 | 0 | 0 | 0 | 1,184,374 |
| Linda Sue Briley, Chief Financial Officer | 0 | 0 | 0 | 39,259 | 157,894 | 86,388 | 283,541 |
| Michael K. Ellis, Chief Development Officer | 0 | 0 | 0 | 28,795 | 157,894 | 86,388 | 273,077 |
| Rhonda J. Parish, Chief Legal Officer and Secretary | 0 | 0 | 0 | 58,696 | 162,754 | 86,388 | 307,838 |
| Davis W. Skena, Chief Marketing Officer | 0 | 0 | 0 | 58,696 | 157,894 | 86,388 | 302,978 |
| James J. Buettgen, Former Chairman, President and Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| F. Lane Cardwell, Jr., Former Interim Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Brett A. Patterson, Former Ruby Tuesday Concept President | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Other Executive Officer* | | | | | | | |
| Thomas A. Williams, Chief People Officer | | | 0 | 28,795 | 157,894 | 86,388 | 273,077 |

## The Proxy Contains Numerous Material Misstatements or Omissions

48.     Defendants filed a materially incomplete and misleading Proxy with the SEC and disseminated it to Ruby Tuesday's stockholders.  The Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting or appraisal decision in connection with the Proposed Transaction.

49.     Specifically, as set forth below, the Proxy fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the background process leading up to the Proposed Transaction; (ii) the valuation analyses

prepared by the Company's financial advisor UBS in connection with the rendering of its fairness opinion; (iii) Ruby Tuesday management's projections; and (iv) insiders' potential conflicts of interest. Accordingly, Ruby Tuesday stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

50. The Proxy omits material information relating to the sale process leading up to the Proposed Transaction.

51. Critically, the Proxy fails to expressly indicate whether the confidentiality agreements Ruby Tuesday entered into with 21 parties, excluding Bidder 8 and Bidder 11, are still in effect and/or contain DADW standstill provisions that are presently precluding each and every of these 21 parties from making a topping bid for the Company.

52. The disclosure of the terms of the standstill provisions is crucial to Ruby Tuesday stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

53. Critically, according to the Proxy, "[a]ll of the confidentiality agreements contained a customary standstill provision prohibiting, among other things, the counterparty from acquiring shares of Ruby Tuesday common stock and waging a proxy contest or other shareholder activism campaign." The Proxy further sets forth that on August 14, 2017, "Ruby Tuesday agreed to waive Bidder 8's and Bidder 11's obligations under the standstill provision of their respective confidentiality agreements to the extent necessary to permit each such party to continue to submit unsolicited confidential proposals to Ruby Tuesday." As Ruby Tuesday did not waive the obligations of the remaining 21 parties under the standstill provisions of their confidentiality agreements, it is highly likely that the non-disclosure agreements entered into with these 21 parties during the sale process contain DADW standstill provisions that are

presently precluding them from making a topping bid for the Company.

54.     The omission of this information is particularly harmful to Ruby Tuesday stockholders as the Company received competitive indications of interest from a variety of parties, who would now be foreclosed from making a topping bid: (i) Bidder 1 which submitted a first-round proposal to acquire the Company for $2.40 to $2.60 per share on April 13 or 14, 2017; (ii) Bidder 4, an unknown consortium bidder which submitted a first-round bid to acquire the Company for $5.75 per share on April 13 or 14, 2017, but was not permitted to participate in the second round of the process as it did not provide further detail on the identity of its equity financing sources; (iii) Bidder 5, which submitted a revised first-round proposal to acquire Ruby Tuesday for a price of $2.75 to $3.25 per share on April 24, 2017; and (iv) Bidder 10, which submitted a first-round proposal to acquire the Company for $2.00 to $2.50 per share on April 13 or 14, 2017, but was not permitted to participate in the second round.

55.     The omission of this information is particularly harmful to Ruby Tuesday stockholders as the Board agreed to a provision in the Merger Agreement (Section 6.03(a)(iii)) that contractually prohibits the Board from releasing any interested party from a previously executed standstill agreement (the "Anti-Waiver Provision").[1]  Whether the Board adopted preclusive measures that have shut out the most likely topping bidders for the Company must be disclosed to Ruby Tuesday stockholders prior to their voting and appraisal decision on the

---

[1] Specifically, the Merger Agreement states:

> [N]either the Company nor any of its Subsidiaries shall, nor shall the Company or any of its Subsidiaries authorize or permit any of its or their respective directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives (collectively, "**Representatives**") to, directly or indirectly . . . amend, modify or grant any waiver or release under, any standstill, confidentiality or similar agreement of the Company or any of its Subsidiaries[.]

Proposed Transaction.

56.     The omission of this information renders the statements in the "Background of the Merger" section of the Proxy false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning UBS' Financial Analyses***

57.     The Proxy describes UBS' fairness opinion and the various valuation analyses performed in support of its opinion.  However, the description of UBS' fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Ruby Tuesday's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on UBS' fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek appraisal.  This omitted information, if disclosed, would significantly alter the total mix of information available to Ruby Tuesday's stockholders.

58.     With respect to UBS' *Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the Company's standalone, after tax, unlevered, free cash flows for October 15, 2017 through May 31, 2022 utilized by UBS in this analysis;[2] (ii) the definition of after tax, unlevered, free cash flows; (iii) the implied terminal value multiples resulting from the analysis; and (iv) the inputs and assumptions underlying the discount rate range of 9.5% to 10.5%.

---

[2] Alternatively, to the extent the "standalone, after tax, unlevered, free cash flows" UBS utilized in its *Discounted Cash Flow Analysis* are disclosed on page 54 of the Proxy, the Proxy fails to and must expressly identify the cash flows used by UBS and whether they were the "Unlevered Free Cash Flow Before Net Operating Loss" figures or the "Total Free Cash Flow" figures set forth in the Proxy.  This information is critically important because use of the Unlevered Free Cash Flow Before Net Operating Loss figures by UBS would have resulted in lower implied per share values for Ruby Tuesday as compared to if UBS used the Total Free Cash Flows and would not have reflected the full value of Ruby Tuesday on a continuing standalone basis..

59. With respect to UBS' *Selected Public Companies Analysis*, the Proxy fails to disclose the individual enterprise value to NTM EBITDA multiples for the selected companies observed by UBS as well as any benchmarking financial metrics of the selected companies and the objective selection criteria.

60. With respect to UBS' *Selected Transactions Analysis*, the Proxy fails to disclose the individual enterprise value to LTM EBITDA multiples for the selected transactions and the financial metrics and any other multiples observed by UBS of the target companies, as well as the objective selection criteria.

61. When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

62. The omission of this information renders the statements in the "Opinion of Ruby Tuesday's Financial Advisor" and "Certain Financial Projections" sections of the Proxy false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Ruby Tuesday's Financial Projections***

63. The Proxy fails to disclose material information relating to the Company's projections provided by Ruby Tuesday's management and relied upon by UBS for its analyses.

64. The Proxy sets forth certain information related to Ruby Tuesday management's May 5, 2017 financial projections and references prior projections dated March 7, 2017,

February 6, 2017, and November 11, 2016, but fails to disclose the prior projections or the details of the revisions thereto. Specifically, the Proxy fails to disclose information related to the: (i) "revised financial projections provided by Ruby Tuesday management dated February 6, 2017, which contained projections that were revised down from the previous financial plan provided on November 11, 2016 to reflect ongoing softness in store performance despite Ruby Tuesday's new initiatives" (Proxy at 31); (ii) "revised financial projections provided by Ruby Tuesday management on March 7, 2017, which contained projections that were further revised down from the previous financial plan provided on February 6, 2017 to reflect ongoing and challenging market conditions in the casual dining industry and the performance of the "Fresh New Garden Bar" initiative" (Proxy at 33); and (iii) and any revisions to the March 7, 2017 projections before Ruby Tuesday management's projections were finalized on May 5, 2017. Proxy at 54.

65. The omission of this information renders the statements in the "Certain Financial Projections" section of the Proxy false and/or materially misleading in contravention of the Exchange Act.

**Material Omissions Concerning Insiders' Potential Conflicts of Interest**

66. The Proxy also materially misleads stockholders as to the potential conflicts of interest faced by Ruby Tuesday management.

67. The Proxy fails to disclose whether any members of Ruby Tuesday management or the Board will continue with the post-close company, as well as the details of any employment related discussions and negotiations that occurred between NRD and Ruby Tuesday executive officers, including who participated in all such communications, when they occurred, and their content. The Proxy further fails to disclose whether any of NRD's prior proposals or indications

of interest mentioned management retention.

68.    Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

69.    The omission of this information renders the statements in the "Background of the Merger" and "Interests of Ruby Tuesday's Directors and Executive Officers in the Merger" sections of the Proxy false and/or materially misleading in contravention of the Exchange Act.

70.    The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting and appraisal decision and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

71.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

72.    During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

73. By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the defendants. It misrepresented and/or omitted material facts, including material information about the actual intrinsic standalone value of the Company, the financial analyses performed by the Company's financial advisor, and Company insiders' potential conflicts of interest. The defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

74. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.

75. By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

76. Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Class Claims Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

77. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

78. The Individual Defendants acted as controlling persons of Ruby Tuesday within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions

as officers and/or directors of Ruby Tuesday and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

79. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

81. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the directors.

82. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

83. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule

14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, Ruby Tuesday's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class and against defendants as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Ruby Tuesday stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: November 10, 2017

/s/ *Paul Kent Bramlett*

Paul Kent Bramlett #7387
BRAMLETT LAW OFFICES
Paul Kent Bramlett #7387/ MS #4291
Robert Preston Bramlett #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Tel.: 615.248.2828
Fax: 866.816.4116
E-mail: PKNASHLAW@aol.com
        Robert@BramlettLawOffices.com

**OF COUNSEL:**                          *Attorneys for Plaintiff*

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
1500 Broadway, 16th Floor
New York, New York 10036
Tel.: (212) 682-3025
Fax: (212) 682-3010
E-mail: racocelli@weisslawllp.com
        mrogovin@weisslawllp.com